Next case is United States v. Mark Zabielski Ms. Pietropalo Good morning, your honors. May it please the court, my name is Renee Pietropalo and I represent the appellant Mark Zabielski With the court's permission, I'd like to request two minutes for rebuttal. Granted. Ms. Pietropalo This case presents an excellent vehicle for this court to distinguish between the threat of harm, which is an element of robbery by intimidation, from a threat of death, which, if it's made during a bank robbery, requires a two-level enhancement to the base offense level. Mr. Zabielski pled guilty to bank robbery by intimidation and this court's model jury instructions define intimidation as actions or words used for the purpose of making someone else fear bodily harm if he or she resists. This court in Thomas cautions sentencing courts to take care that they don't equate threats of violence with threats of death because treating all threats of harm or all threats that occur in the course of a bank robbery would defeat the distinction that the two-level enhancement seeks to capture. So the test is objective. Would the defendant's conduct instill in a reasonable person who's the victim of a bank robbery the fear that she will be killed, that the robber is threatening to kill her? And the answer here is no. And so we look at what the district court actually found. The district court said that a reasonable person in the teller's position would have viewed Mr. Zabielski's words and actions as a threat to kill, where Mr. Zabielski said, I need this money now and you have two minutes to give it to me. And he's standing pretty close to the teller counter and he has a bulge in his pocket. Now, a demand for money, essentially what this is, is a demand for money within a limited time period and that is quintessential intimidation. So your concern is that almost any scenario in a, certainly a bank robbery, but almost any robbery scenario in which there were spoken words would qualify for a threat of death? If it applies here, then yes, I would say that it's defeating the distinction. It would subsume all threats. And so what's the distinction between this and Thomas? In Thomas, you have, first let me say that Thomas, the court was very clear that that was a very close case. It was Bono Man's clear that it was a threat of death. But you had a threat in that case which was, give me the dye packs now, or a dye pack will bring me back for your ass, is what he said. And the court said that's a direct threat to the teller, your ass. And, pardon me, and... It is what it is. It is what it is. You should see some of the words that appear in our opinion. And colloquially, I did quote the Urban Dictionary for some help with this, but colloquially, I'm coming back for your ass means I'm going to kill you. So that was a very different scenario. And here, he said nothing. He said, well, he said, give me the money now. You have two minutes. There's no threat. There's no gesture. There's no simulated appearance of a weapon. There's no simulated throat slashing that we've seen in some of the other cases. I wanted to stress that the, again, Mr. Zabilski pled guilty to the bank robbery by intimidation under 2113A, and the base offense level for that is 20. But 2113B is bank larceny, which is a lesser-included offense, and it's a taking from a bank without force and violence or intimidation. And the base offense level for bank larceny is actually six. So there's this 14-level increase in the guidelines already, and it's done with the recognition that bank robbery by force and violence or by intimidation is serious. It creates this threat of harm, and it's a scary situation. And it's that threat of harm, which is an element of the robbery by intimidation, that carries serious sentencing consequences, and the guidelines account for that with this 14-level increase. But it's the threat of death that we're talking about, and that's an extra serious ‑‑ it carries extra serious consequences, this additional two-level enhancement. And if you affirm on these facts, what we're going to do is defeat the distinction, again, that the guideline enhancement seeks to apply. That's my question. I'd like to talk big picture here, because I find that this is a lenient sentence under the circumstances, which is fine under Tomco. But it's remarkable to me that the defendant is appealing such a lenient sentence, and I don't blame you. If I were in your shoes, I'd do the same thing, because our jurisprudence says that where there's procedural error, you get a do-over. But let's face it, Mr. Zabilski's guidelines range without the enhancement was 30 to 37 months, correct? The guideline range without the enhancement was actually ‑‑ Yes. And he gets a downward variance sentence to 24 months. Yes. And without the enhancement, my notes indicate 30 to 37 months. Is that incorrect? I actually have an offense level of 17. I had 24 to 30 months. 24 to 30 months. All right, well, let's accept that. I could be incorrect on that. So let's say it's 24 to 30 months. He got a bottom of the guideline sentence on the range that you say was the appropriate range. Right. Isn't this a perfect case for this court to say, maybe Judge Fischer got it right, maybe she got it wrong, it's a close call, how many angels can dance on the head of a pen, we don't know. But post Booker, it's all about the big picture. It's all about what the man did, what he's like, what are his priors. And she went through all that in excruciating detail, which is good. I don't mean to say that pejoratively. She went into great detail. It's a clean sentence. It's a fair sentence. It's lenient and fair, and it's clean, and what are we doing? Shouldn't we articulate some harmless error doctrine for cases just like this? This court has already reached that issue and decided, no, that harmless error is absolutely not appropriate, and I can point the court to Langford in particular. Do you think Langford prevents this panel from doing that? Yes. I mean, if you look at the post-argument briefing in that case, it was all about if there's a guidelines calculation error at step one, but the range that's actually imposed either overlaps or encompasses the correct range, can the error be harmless? And the court was very clear in saying, no, it cannot be a harmless error. The court always has to start from the correct guideline, and then from there determine what's the appropriate sentence based on, you know, departures and variances, because you can't reach that decision unless you're starting from the correct starting point. So that question has been answered definitively. It cannot be a harmless error standard. So is your point that, from your perspective, the big picture is there's got to be a clear and unequivocal statement to lead to the conclusion that the threat of death enhancement is applicable? Did you mean to ask if the defendant has to make a statement during the – No. I mean – I'm sorry. No. Judge Hartman said, let's take big picture. This is a fair sentence. What are we doing here? Oh, I – Essentially. He said it much more – No, much more concisely. Thank you. But your retort, I presume, is, well, Judge, that may be so, but big picture, this Court hasn't come out with a sufficiently clear statement of what threat of death is, because in the absence of that, the affirmance of this particular sentence will mean that the threat of death's application will be so broad, it will be applied to almost any bank robbery. I do agree with that statement. If you look at the case law from the Third Circuit, they have – this Court has never affirmed threat of death enhancement on these kind of facts. The closest that you get is the Thomas Cage, which Judge Greenaway pointed out, but the facts are very different again. There's no weapon there. There's no weapon here? Well, no, here there's – There's no weapon. Here there's certainly a reasonable apprehension of a weapon because of the bulge in the jacket. I don't remember anything like that in Thomas. There's – actually – Thomas, you have the verbal – A verbal direct threat to – A verbal threat, and here you've got a physical threat. A bulge in the pocket for a guy robbing a bank is a physical threat. I did lodge the exhibit with the Court, which is a video of the robbery, and you will be able to see for yourselves the bulge in the pocket. But it would be an incredible leap to – it would be an incredible leap to infer from the existence of a bulge in a pocket on a winter day that the pocket contains a gun. And cases that have affirmed a threat of death enhancement – Well, that's unreasonable. I mean, the whole point of them – I mean, I don't have a jacket now, but if you saw a bulge, I mean, the inference you want – I want you to draw if you see this is that I have a gun. What other inference would I want you to draw? The cases that have affirmed where there's implied possession of a gun, which is I think where we're going with this, is the defendant has done something affirmatively to convey the presence of a gun. And coupled with that, there's been a statement from the defendant suggesting a threat – You have two minutes to give me the money is not enough? You have two minutes. That's – Give me the money and you have two minutes. Yeah, and I point to the court – to the Gilmore case – And you're the teller. You have two minutes. If he had gestured to the pocket in a suggestive way – that's what the cases say, a suggestive gesture to the wait man coupled with a statement – Do you want to make it home tonight? Or you don't want to know how serious I am. Things like that. The record is very clear. There's absolutely no gesture to the pocket. And you look at the circumstances of the totality here. We have a man who walks in. The teller believes that he's a customer. He's familiar to her. She believes she's seen him before in this small neighborhood. He gives her a note. There's a confused conversation. She's not sure that this is a robbery initially. And then he says, give me the money, you have two minutes. The court describes him as calmly and patiently waiting for her to comply. He's largely not looking at the teller. He's looking away. He's squinting and blinking in this weird way. And the Wooten case tells us that even if you were to interpret the mere existence of a bulge in a pocket as somehow threatening, you look at the other circumstances that might mitigate whatever effect. Was there some indication that the teller feared for her life? No, there was not. She said that she feared harm. That's what she feared. And the existence of the bulge, the test is would a reasonable person fear they're about to be killed? And so to say you see a bulge in someone's pocket and you think you're going to be killed, that's an incredible leap. And none of the cases have held that. They have held a gesture, a suggestive gesture, coupled with threatening words. That can be a threat of death, and that could be the inference. But not the bulge standing alone. And I would recommend that the court watch the exhibit of the robbery because you will see it's a very tightly fitted jacket, and you can draw your own conclusions from that. Did the court want me to continue on to the other sentencing issues? I really felt that the threat of death enhancement was the most obvious error. We'll hear you on rebuttal.  Thank you, Ms. Fitzgerald. Thank you. Ms. Irwin? May it please the court, Laura Irwin from the U.S. Attorney's Office on behalf of the government. The issue of whether or not the district court properly applied this enhancement is one that this court should not have the least bit of concern about for a number of reasons. We need to start with five things in mind.  One is this is a reasonable victim standard. It's an objective. What would a reasonable victim respond to, and how would they respond in this circumstance? Second, it's by a preponderance. Let me ask you about that. Although I've never been a teller, I'm married to a male lawyer who was once a teller. Any time a teller is approached, they're in fear, so it can't principally focus on the reasonable teller, right? Because every situation, I would think, a teller has got to be in tremendous fear, and rightfully so. I'm not trying to undermine that notion. So can we really focus on that? Well, the distinction I would draw is it's not a subjective test. You can't just go with this teller thought. In this case, the teller did testify. It's part of the quantum of things that a court looks at. Right, but here the teller didn't testify that she had a fear of death, did she? She did not. She did not make that statement at her testimony. But that's part of one of the important things for this court to remember is that nowhere has the Third Circuit ever said there is a dispositive criteria that would qualify a defendant for this enhancement. Instead, in cases like Thomas and Day, Figueroa, they've all been it's a totality of the circumstances. Don't you, or wouldn't you, I should say, draw a distinction between this case and Thomas? Actually, Your Honor, I think the distinction is drawn in our favor. In Thomas, the defendant said, do this or I'll be back for your ass, leaving everyone to wonder what will happen to me later. In this case, the defendant said, give it to me now. And so keeping that in mind with all the other facts we have, I believe there's a lot more on the record to support this enhancement than what. In what bank robbery does the scenario exist when the teller does not think that they have to act now? Whether it's spoken or acts are done to induce that thought, I mean, every teller believes that they have to act now. Well, that's true. But if the concern is that that would lead to a per se rule, I don't think that's the case for a number of reasons. One is because the court has made clear the test is the totality. Second, this particular district court recognized that there's a risk of having a per se rule, and that's why the other facts here are so important. One of my main points would be none of these facts are challenges clearly around us. So we have a situation where let's take it step by step. This individual comes in, and it is undisputed that when he first approached, she was not afraid. She was confused. I thought I recognized him. He handed me this note that said $10,000. I asked him, do you want this from your checking account or your savings account? And there was confusion. There was a dialogue back and forth. The difference between the parties on this point is that this encounter is not static. It is a dynamic process. She went from confusion. As she testified, once I realized it was a bank robbery, the situation changed. And what did she see and feel and hear from his actions, his words? She saw his bloodied knuckles. He was bigger than her, as the district court found. He was leaning close to her. He said, I want it now. You don't understand. I want this money now. You have two minutes to give it to me. She testified that she noticed this bulge. She thought it might be a weapon. That was her testimony. That's not challenges being clearly around us. She testified, I was so scared I was afraid to give him the bait money for fear that he would do something to me. She testified, I was afraid he was going to come back because I didn't give him the full $10,000. So this is not a case where we have a meager record to show that this enhancement was proper. It's actually a very full record. It's his words. It's his actions. It's his person. You have a wonderful record for a threat of harm. Our question, well, yeah, I will be presumptuous. It is our question, is whether it rises to the level of threat of death. And for subjective statements, I know it's just one factor. It doesn't seem to get there. It seems, you know, whether it's Thomas, I think, is the best case as a comparator from your perspective. But most of the other cases, it's much more explicit language. Well, the court has never held that there has to be testimony either from the teller or from the perpetrator that the death is going to be the result. In fact, the opposite conclusion has been drawn in many cases, which is if there's a weapon, people use weapons, and when a weapon is used upon you, death is a possibility. And I think that's sufficient. So on these facts, it would be our position when you take the totality that, again, no findings of fact are being challenged is clearly erroneous. And also keeping in mind, the challenge here is a de novo application. They're saying as a matter of law, the district court erred. So they're saying the facts are all true. The district court just made a problem applying them. And when that is the review, this court exercises very deferential review of a district court's application of facts to law. And we would argue that that, in fact, would be appropriate in this case. However, to return to Judge. What is the videotape of the robbery would permit an inference that there was a threat of death here? I believe so, Your Honor, given the bulge in the defendant's pocket and his bloodied knuckles, et cetera. Returning to Judge Hardiman's argument, again, I would take issue with the position taken by my opponent that this court has been very clear that there will never, ever be a harmless error analysis when there is a guideline application error. Your quotation from Langford was pretty strong in that regard. It persuaded me that if we're to do it, we'd have to do it en banc, that this panel couldn't do it. Why is that wrong? Well, because I think in Langford, there is language in there that said it has to be only in the rare case where there will be harmless error. And I think if you look at the subsequent decisions since then, in fact, the most recent one was just several weeks ago, and I believe Judge Mastey was on the panel, a case by the name of DeMuro. Again, the court said that it's a rare, rare circumstance. We don't find it here. And I will fully acknowledge we did not argue harmless error in this case. However, the court may affirm on any basis that's shown on the complete record, and we believe if the court does need to get to this point, that this would be a case. And here is why. Because, as Judge Hardiman pointed out, this individual received a 24-month sentence. And I'm not sure where Renee got her range, but I agree with Judge Hardiman. When I recomputed it, it came to 30 to 37 months. But in any event, we have a very thorough record in this case, and there is nothing to indicate that this district court used anything related to the guidelines to come up with a 24-month sentence. Instead, just the opposite is true. She looked at every factor thoroughly, as logically and as organized as possible, and came to the conclusion that this was a case in which a 24-month sentence was reasonable. There's a lot of illogic here, though. I mean, frankly, from my perspective, the illogic is why is the government seeking these enhancements? I mean, all you're doing is making more work for your office. Well, I shouldn't be talking to you. I should be talking to your trial lawyers. Why in the world, if it's a jump ball or a close call, reasonable minds could differ? Why seek the enhancement? 3553A drives the bus post-booker in all these sentences. All you're doing is creating new work. If you hadn't sought this enhancement, there's no appeal. There's no case. The case is over. Every criminal lawyer in this room knows that this 24-month sentence is a clean sentence on both sides of the aisle. Everybody knows that. These just strike me, and if I'm expressing some frustration, it's because I'm frustrated. These are academic exercises that are more appropriate in a law school rather than in the courts. So why are your lawyers steadfastly pursuing these things instead of just arguing the totality under 3553A? I hear what you're saying, and the message will be delivered. Well, isn't it a fact in this case that the parties had agreed in the plea agreement that the guideline range should be 30 to 37 months, that the offense level should be 19? It was the pre-sentence investigation report by the probation officer that recommended the two-level enhancement. Right, and that was disputed by the defendant, and that's why there was a hearing at sentencing about whether or not that would apply. I did not ask that question of the trial assistant in this case when I was preparing. Could the assistant U.S. attorney at that time have said, Your Honor, we're not going to seek this two-level enhancement, and the judge still say, I think it's appropriate, and go ahead and impose it? Certainly. And then where are you left with respect to defending the sentence? Certainly, I think that could have happened. Which brings me to the next level of illogic. Why would any trial judge grant the government – the trial judge knows that they're going to go down the ladder under 3553A. If it's a close call, why not deny the enhancement and do what you're going to do? It's still a – I don't understand. I'm so confused by what's going on in the sentencing arena with the trial courts and these enhancements, because we've – we've exalted – we've exalted these departure issues and these guideline adjustment issues to a level that is completely inimical to what Booker was trying to do. Would you agree with that or disagree with that? I would certainly agree with you that it has taken on a life of its own. But with regard to this particular case, I think – and this is just an assumption on my part – that there was some concern that the defendant was going to be asking for a sentence of probation, so the trial assistant was trying to ensure that a full picture was given to the district court. Whether that was right or wrong, certainly we can re-evaluate whether or not guidelines enhancements should be sought. But I think the bigger picture is the Supreme Court has said the guidelines remain relevant. They still provide information. It's a tool for everyone to know where everyone else is going. It's a quantified system that provides feedback. Every year the Sentencing Commission analyzes all these sentences and provides information. So they're still relevant. Even Booker has told us. Has Mr. Zabowski begun serving his sentence? Yes, he has. He's going to be out, I believe, next April. So our position would be – They're still relevant, but I guess what I'm suggesting to you is what's really relevant in the post-Booker era is what happened, not what box you fit it into. Two points here, three points here. What's relevant is what are the facts? And the reason this gentleman, I understand from reading the record, got a very lenient sentence for bank robbery is because in the pantheon of bank robberies, he's about as soft as they get. That's true, Your Honor. He even bailed the money back. Right. He spent a little and sent the majority of the money back. The other point I would raise with regard to whether or not it makes sense to have departure or have enhancements under the sentencing guidelines is you seem to suggest that this district court at least knew at the outset that she was going to grant him a downward variance, and that's actually not what happened in this case. She denied his request for departures and variances on the four grounds that he moved for, but she, sua sponte, once she listened to him allocute, granted him this departure based on his true remorse. It's not a departure. It's a downward variance. I'm sorry. It's a variance. I misspoke. But the suggestion that we all know what the sentencing judge is going to do really, in this case, doesn't hold true because we didn't know that that was going to happen. And she didn't know it was going to happen until she got to that point in the sentencing where she heard him articulate his true remorse for what he had done. Returning to the harmless error issue, as I said, I don't believe this court has ever come up with a fast and hard rule that there will never, ever be harmless error. And this is a case in which I believe it's distinguishable from all the other cases in which the court has refused to find a harmless error, like Fumo, Vasquez, Lofink, and DeMurro, because this is a case in which you have such a drastic downward variance. Those other cases, you know, in DeMurro, the same guideline range was going to be used with or without the mistake in the guideline calculation, and this court felt there was no way to determine whether or not the same sentence would obtain upon a remand. Our position would be that in this case, given the magnitude of the variance, given that there's no connection to it and its magnitude to the guideline calculation, and given the thorough statement by the district court as to why this was a proper sentence, we believe that if the court should reach the issue, that the error would be deemed harmless. Are there any other questions on the other points I'd be glad to address? No. Thank you, Ms. Erwin. Thank you. We would ask that the court affirm the judgment of the district court. Rebuttal, Ms. Petropavlov? First, let me say I did make a mistake with the guidelines calculation. I forgot a different enhancement that the court had applied. Second, let me say- So it would have been 30 to 37. Yes, you are correct. I apologize for that. So he ended up six months below the bottom of the guidelines range that you say is the correct one. With respect to the harmless error analysis, though, again, the government never raised harmless error, and if the court's inclined to go in that direction, I would ask permission to file post-argument briefing on the issue if you think that it would be helpful to you. I would appreciate briefing on the harmless error issue. Go ahead. I apologize. Just briefly, from my memory, what this court has said about harmless error is if the court is extremely clear that no matter what, I'm giving 24 months, and I don't care if this is the guideline or that's the guideline or this is your argument or that's your argument, I'm always going to give 24 months. In those cases, some courts have applied harmless error analysis, but that is not what happened here. And in terms of- I'm speaking for myself. I'm more concerned about whether this panel has the power to do it. You made a good argument, I thought, earlier that Langford precludes it. Ms. Irwin made a counterargument that sounded good also, so I'm curious to see whether that's foreclosed or not. I will submit some post-argument briefing on that matter. If you would. Yes. And I just wanted to point out just a few factual inconsistencies. The teller said she thought there was a gun or a knife or something. She didn't say she thought the bulge contained a gun, definitely. And she-the government is referring to the teller's after-the-fact fear, the lingering fear, the after-effects of the robbery. And that, in fact, is what the government argued below, that in determining whether to impose this enhancement, the court should consider the lingering effects of the robbery, that she transferred banks, that she didn't want to park in that parking spot anymore. And that's why this issue was reviewed de novo. The court did-it is a guidelines interpretation question. The court did consider the subjective fear of the teller and their subjective heights and ages. And she also considered the alleged intent of the defendant when she says he squinted-he says that he squinted to look angry. We know from the teller that she never believed that he looked angry. She thought-and the government said he looked weird, the way he was blinking. So essentially what we have here is a request for money within a time limit, and the existence of a bulge without any gesture to the bulge, without any threatening or suggestive motion to the bulge, and without any threat of even harm. This is quintessential intimidation. It's something that's covered and penalized by the 14-level bump between bank larceny and bank robbery. And we would submit that the threat of death enhancement just was improperly applied, and that the case should be reversed. Thank you, Mr. Petropavlov. Thank you. Ms. Irwin, the case was very well argued. We'll take the matter under advisement.